UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Plaintiff,                        Case Number 14-20562

v.                                                        Honorable David M. Lawson

TAMMY BROWNLEE,

                    Defendant.

_____/

**ORDER GRANTING MOTION FOR COMPASSIONATE RELEASE**

Defendant Tammy Brownlee has filed a motion asking the Court to reduce her prison sentence to time served under the compassionate release provision of 18 U.S.C. 3582(c)(1)(A)(i), as amended by section 603(b)(1) of the First Step Act of 2018, Pub L. 115-391, 132 Stat. 5194, 5239. She has less than two years left on her 96-month sentence, and she has outlined a host of medical conditions that have caused her current poor health, including contracting COVID-19 and suffering severe complications. The government concedes that Brownlee has exhausted her administrative remedies and that she has demonstrated extraordinary and compelling reasons for the relief she requests. It argues, however, that Brwonlee could be a danger to society if released and that applying the factors listed in 18 U.S.C. § 3553(a) militate against it. Because Brownlee is a medically vulnerable individual who has served more than half of her prison sentence and has exhibited a dangerous reaction to the highly contagious coronavirus, the relevant factors favor Brownlee's position. The Court will grant the motion.

I.

Defendant Tammie Brownlee pleaded guilty to one count of robbing a credit union, 18 U.S.C. § 2113(a). On August 15, 2018, she was sentenced to 151 months in prison. The defendant appealed, and during the pendency of the appeal the government and the defendant reached an

agreement that she should be resentenced.  The Court subsequently resentenced the defendant in a second amended judgment to a reduced term of 96 months in prison.  With credit for her lengthy pretrial detention, the defendant presently has served nearly 73 months or 76% of her eight-year term.  She is held in the custody of the Bureau of Prisons at Carswell Federal Medical Center, which is designated by the BOP as an "administrative security federal medical center" that houses around 1,280 female inmates.  Public records of the BOP indicate that the defendant is scheduled to be released from prison on March 11, 2022.  Brownlee is 54 years old.

On August 28, 2020, Brownlee filed through counsel her motion seeking compassionate release under 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act of 2018.  In her motion, Brownlee argued that she is qualified for release because of her hypertension, obesity, diabetes, and diagnosis with hepatitis C.  She also asserts that she previously became infected with coronavirus, which she says resulted in a "serious hospitalization."  The government has filed a response opposing the motion on the merits.

The most recent data disclosed by the BOP indicates that there are two active coronavirus case among inmates and three among staff at the Carswell facility.  Also, 522 inmates and one staff member previously had the disease but now have recovered.  Reports indicate that six inmates have died.  *See* https://www.bop.gov/coronavirus/.

## II.

As a general rule, "a federal court 'may not modify a term of imprisonment once it has been imposed.'"  *United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020) (quoting 18 U.S.C. § 3582(c)).  "But that rule comes with a few exceptions, one of which permits compassionate release."  *Ibid.*  "The request may come through a motion in federal court filed by the Director of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A).  Or it may come through a motion filed by the

inmate after he has 'fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the [prisoner]'s behalf' or after 'the lapse of 30 days from the receipt of such a request by the warden of the [prisoner]'s facility, whichever is earlier.'" *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)).

Upon a proper motion via either avenue, the Court may, "[a]fter 'considering the factors set forth in section 3553(a) . . . reduce the prisoner's sentence if it finds that 'extraordinary and compelling reasons warrant such a reduction' or if the '[prisoner] is at least 70 years of age,' has 'served at least 30 years,' and meets certain other conditions." *Ibid.* (quoting 18 U.S.C. § 3582(c)(1)(A)(i), (ii)). Brownlee relies on subparagraph (i) of the statute. Under that provision, the Court can order a reduction of a sentence, even to time served, *first*, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," *second*, if "extraordinary and compelling reasons warrant such a reduction," and *third*, if the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i). The Sentencing Commission's policy statement is found in U.S.S.G. § 1B1.13, which simply recites the statute. The commentary adds gloss, which does not have the force of law. *United States v. Havis*, 927 F.3d 382, 386 (6th Cir.), *reconsideration denied,* 929 F.3d 317 (6th Cir. 2019) (en banc) (holding that the "commentary has no independent legal force — it serves only to *interpret* the Guidelines' text, not to replace or modify it").

The government concedes that the request for release has been administratively exhausted, and it also concedes that the defendant's obesity and "other medical conditions" suffice to establish an extraordinary and compelling medical risk under the second required element for compassionate release. The government argues, nevertheless, that release is not favored because the defendant's extensive criminal history, which includes several assaults and lesser crimes, along

with her extensive history of noncompliance on probation, establish that she would be a serious danger to the community if released.  The government points out that the present crime and several of the defendant's previous convictions were committed while on probation, which casts significant doubt on her assertion that any danger she poses to the community adequately could be mitigated by supervision.  It also argues that the defendant should not be released because the factors in section 3553(a) do not favor it, nor do the Sentencing Commission's policy statements.  It insists that compliance with the Sentencing Commission's policy statement is mandatory, and points to one line in section 1B1.13 that requires the prisoner to prove lack of dangerousness.  But that requirement is a condition of 3582(c)(1)(A)(ii).  Brownlee has invoked section 3582(c)(1)(A)(i), which contains no such requirement.

Although proof of lack of dangerousness is not an element the defendant must prove under section 3582(c)(1)(A)(i), it is not irrelevant.  It is a factor incorporated in section 3553(a), which must be "consider[ed]" before release for extraordinary and compelling reasons may be allowed.  *See* 18 U.S.C. § 3553(a)(2)(C) (requiring a sentencing court to consider "the need . . . to protect the public from further crimes of the defendant").  And any sentence reduction also must account for "the seriousness of the offense," the need "to promote respect for the law," and "afford adequate deterrence to criminal conduct."  *Id.* § (2)(A), (C).  These factors are to be considered together with the prisoner's circumstances to arrive at a conclusion that they are sufficiently extraordinary and compelling to justify a sentence reduction.

The crime in this case was serious, involving robbery of a financial institution accomplished by the defendant's pretended possession of a gun.  However, the offense otherwise was nonviolent.  The government points to the defendant's other prior convictions for assaultive crimes, including assault and battery, assault with intent to rob while armed, and resisting arrest.

But Brownlee's offenses, aside from those, were minor and nonviolent; including a false report of a sexual assault, disorderly conduct, and "numerous instances of retail fraud."

The defendant also has a demonstrated history of noncompliance while under supervision, including her commission of new crimes while on probation in 1994, 1995, 1996, 2008, and 2013. The instant offense was committed while Brownlee was on yet another term of probation. Nevertheless, the defendant represents in her reply that she presently has been placed by the BOP on a waiting list for halfway house placement, and prison records indicate that she should be eligible for placement in home confinement by September 2021. Although the defendant's release is not without tangible hazard, she also is not entirely incorrigible, nor is she among the most recalcitrant or heinous offenders that have come before this Court.

The defendant has done well in a prison setting and has completed education programming, along with courses in anger management and substance abuse programs. She has only minor disciplinary citations, and none for violence. Now in her mid-50s, the defendant is significantly older now than when she committed many of her earlier crimes, and she correctly points out that the U.S. Sentencing Commission has recognized that the rate of recidivism overall drops significantly with age. U.S. Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, at 11 ("While there are vast differences among individuals which are not explained by age, age is generally a strong factor influencing the likelihood of committing crime, although the reasons for this are complex."), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

This is a close call, but on the whole, the defendant has made a persuasive case that in her present situation, granting relief would not contravene the Congressional mandate to consider the need to protect the public from further crimes committed by this defendant. Moreover, the

defendant has served 76% of the prison term for her crime, which is sufficient in this case both to promote respect for the law and to deter her and others from future offenses, notwithstanding the Court's finding at the resentencing that the term then imposed was not longer than necessary to achieve those ends.

To establish extraordinary and compelling reasons for the relief she requests, Brownlee points to the conditions of her physical health, arguing that she is vulnerable to complications if she were to contract COVID-19 again. And she is understandably concerned about being infected with the coronavirus. The present crisis undoubtedly stands as the greatest singular disruption to our civil society in living memory. "The COVID-19 virus is highly infectious and can be transmitted easily from person to person. COVID-19 fatality rates increase with age and underlying health conditions such as cardiovascular disease, respiratory disease, diabetes, and immune compromise. If contracted, COVID-19 can cause severe complications or death. Because there is no current vaccine, the Centers for Disease Control and Prevention ("CDC") recommends preventative measures to decrease transmission such as physical distancing, mask wearing, and increasing focus on personal hygiene such as additional hand washing." *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020). "The COVID-19 pandemic is extraordinary and unprecedented in modern times in this nation. It presents a clear and present danger to free society for reasons that need no elaboration." *United States v. Ortiz*, No. 16-439, 2020 WL 3640582, at *2 (S.D.N.Y. July 6, 2020). "[T]he crowded nature of federal detention centers presents an outsize risk that the COVID-19 contagion, once it gains entry, will spread. And, realistically, a high-risk inmate who contracts the virus while in prison will face challenges in caring for himself. For these reasons, in the past months, numerous [federal] courts . . . have ordered the temporary release of inmates held

in pretrial or presentencing custody and, in more limited instances, the compassionate release of high-risk inmates serving federal sentences." *Ibid.* (collecting cases; footnotes omitted).

It is widely recognized and publicly acknowledged that persons who are seriously obese face an increased risk of severe consequences from potential COVID-19 infection. *United States v. Lassister*, No. 17-232, 2020 WL 3639988, at *4 (D. Md. July 6, 2020) ("The risk factors include age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system.") (citing Coronavirus Disease 2019 (COVID-19), People Who Are At Risk for Severe Illness, Centers for Disease Control & Prevention (June 25, 2020), https://bit.ly/2WBcB16).   The government concedes that the defendant's severe obesity based on a BMI of 45.2 qualifies as a recognized significant risk factor. *See* WebMD: What is Body Mass Index (BMI) and How Do You Calculate It?, https://www.webmd.com/diet/obesity/qa/what-is-body-mass-index-bmi-and-how-do-you-calculate-it.

Notwithstanding that the defendant previously contracted COVID-19 and survived, she remains at a significantly elevated risk from the disease.  When she was previously infected, her condition required hospitalization and an extensive antiviral treatment regime, along with mechanical breathing assistance, to combat the severe respiratory compromise that ensued from the virus.  The progress of her disease suggests that she remains at serious risk of fatal consequences if she catches the virus again.  And no convincing medical evidence yet exists to demonstrate that she has any assurance of prospective immunity.  The probability of reinfection at the Carswell facility, while perhaps not as extreme as it once was, remains tangible.

Medical notes from March 30, 2020 indicate that the defendant's BMI was 45.2, which is dramatically above the threshold of 30.0 recognized by the CDC as a significant medical risk

factor.  Medical Report dated Mar. 30, 2020, ECF No. 50, PageID.399.  The defendant asserts that, following her hospital stay and sedentary recovery, her weight has increased, and her BMI now is even higher.  Federal courts have recognized obesity as posing sufficient medical risk to establish extreme and compelling circumstances weighing in favor of release, where the inmate is confined at a facility with an active COVID-19 outbreak.  *United States v. Olawoye*, No. 15-00172, 2020 WL 4559816, at *4 (D. Or. Aug. 7, 2020) ("Even without the presence of other health conditions, obesity alone is the 'most significant risk factor, after only older age, for being hospitalized with Covid-19.' Further, the CDC has noted that, regardless of age, 'having obesity, defined as a body mass index (BMI) of 30 or above, increases . . . risk of serve illness from COVID-19.' Defendant has a body mass index of 31.9, which is classified as obese." (quoting Roni Caryn Rabin, Obesity Linked to Severe Coronavirus Disease, Especially for Younger Patients, The NY TIMES (Apr. 17, 2020)  https://www.nytimes.com/2020/04/16/health/coronavirus-obesityhigher-risk.html;  CDC Risk Factors, *supra*).

Brownlee's medical records also indicate that she has been diagnosed with Type 2 diabetes, which is another recognized serious medical risk factor.  Medical Report dated Aug. 4, 2020, ECF No. 50, PageID.259; *see* CDC Risk Factors, *supra*.

The recent medical notes also indicate a diagnosis of essential hypertension, for which the defendant has been prescribed medication.  Medical Report dated Aug. 4, 2020, ECF No. 50, PageID.260.  However, the same file notes indicated a blood pressure reading of 102/64, well within normal range, suggesting that the defendant's hypertension is well controlled by her medication regime.  The CDC states that individuals with hypertension "*might* be at an increased risk for severe illness from COVID-19."  CDC Risk Factors, *supra* (emphasis added).  Drilling down, though, that condition is grouped with "serious heart conditions" that predispose a person

to higher risks of complications. Also included are "heart failure, coronary artery disease, congenital heart disease, cardiomyopathies, and pulmonary hypertension." *Ibid.* Although the CDC recognizes "pulmonary hypertension" as a serious heart condition that may put people at a higher risk of severe COVID-19-related complications, federal courts have held that essential or systemic hypertension, in contrast with a more serious specific diagnosis of pulmonary hypertension, does not constitute a recognized serious risk factor for coronavirus infection. *E.g.*, *United States v. Allen*, No. 15-00139, 2020 WL 5573820, at *5 (M.D. Tenn. Sept. 17, 2020) ("Defendant's diagnosis of high blood pressure, which Defendant's medical records do not indicate is a specific, or otherwise serious form of high blood pressure, does not constitute an extraordinary and compelling reason for compassionate release. This is especially true because Defendant does not allege that the BOP facility in which he is incarcerated is not adequately managing his condition, and Defendant's medical records indicate that his condition is in fact being managed with medication while he is incarcerated.") (collecting cases).

The defendant's medical records also indicate a diagnosis with Hepatitis C, but that underlying chronic disease is not recognized by the CDC guidance as a serious risk factor for coronavirus infection.

The government's position that the defendant's risk is mitigated due to prospective immunity from her past infection is at best questionable, and the most recent guidance from the CDC indicates that the scientific evidence presently available does not support a conclusion that persons infected with COVID-19 are immune from further disease after recovery. *See* CDC: Updated Isolation Guidance, https://www.cdc.gov/media/releases/2020/s0814-updated-isolation-guidance.html ("Contrary to media reporting today, this science does not imply a person is immune to reinfection with SARS-CoV-2, the virus that causes COVID-19, in the 3 months following

infection.  The latest data simply suggests that retesting someone in the 3 months following initial infection is not necessary unless that person is exhibiting the symptoms of COVID-19 and the symptoms cannot be associated with another illness."); CDC: Clinical Questions about COVID-19, https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html ("There is no firm evidence that the antibodies that develop in response to SARS-CoV-2 infection are protective. If these antibodies are protective, it's not known what antibody levels are needed to protect against reinfection."). Instead, the most recently available guidance advises only that the science demonstrates that infectiousness ends within 10 days after the onset of symptoms or within 20 days for those who are severely ill, and the fact that a person tests positive for the virus does not warrant repeated testing or isolation after those presumptive infectious periods have expired.

In sum, the defendant has established that she has at least two serious medical risk factors — obesity and Type 2 diabetes — which the government concedes are sufficient to support a finding of an extraordinary and compelling medical risk.  There is no convincing medical evidence yet to suggest that she prospectively is protected from reinfection.

Another pertinent consideration is the probability that the defendant may contract the disease again in her present situation of confinement.  With more than 520 historical cases, the outbreak at Carswell certainly has been among the worst in the federal prison system.  But it appears that prison officials at last mostly have succeeded in containing the outbreak, since there presently are only two active cases among inmates and three among staff.  Nevertheless, the risk of reinfection is at least tangible, while active cases remain in circulation.  And the government's position that the defendant is at low or no risk of reinfection is somewhat less reassuring, considering the BOP's admitted failure to implement any comprehensive prophylactic testing program, which calls into doubt the figures that it has reported.  *See Wilson*, 961 F.3d at 849 (Cole,

J., concurring) (observing that in the absence of any program of comprehensive prophylactic testing, reports of low infection rates are questionable at best); *see also United States v. Campbell*, No. 03-4020, 2020 WL 3491569, at *9 (N.D. Iowa June 26, 2020) (same).

As illuminating as the discussion of risk factors may be, it is less significant in this case than others.  Brownlee already contracted COVID-19 and suffered severe complications (as the risk factors might have predicted).  And although the defendant previously contracted the disease, was hospitalized, and recovered, the severity of the prognosis that warranted hospitalization and the extensive course of treatment employed to address her very serious condition tends in this case to elevate rather than mitigate the estimation of her present, prospective risk of serious or fatal consequences, if she contracts the virus again.  Brownlee was tested for COVID-19 on July 4, 2020, although notes indicate she was then asymptomatic.  Medical Report dated July 4, 2020, ECF No. 50, PageID.389.  By July 6, 2020, she had a cough.  *Id.* at PageID.388.  At follow up exams on July 8 and 9, 2020, she reported "feeling well," and was again asymptomatic.  *Id.* at PageID.386, 383.  However, on July 10, 2020 oxygen was administered when she had trouble breathing and her blood O2 level was low, and she was transferred to a local hospital.  *Id.* at PageID.380-81.  Hospital notes from July 13, 2020 indicate that within three days after her admission she had been diagnosed with bilateral pneumonia resulting in respiratory failure.  Her treatment plan included administration of remdesivir, dexamethasone, and convalescent plasma; she also was put on an "airvo" device to aid her respiration.  *Id.* at PageID.379; *see* https://www.fphcare.com/us/hospital/adult-respiratory/optiflow/airvo-2-system/.  One week later, on July 20, 2020, Brownlee had substantially recovered and was discharged back to Carswell FMC, although notes indicate that she was to complete the antiviral regimen.  *Id.* at PageID.366. Brownlee reported minimal symptoms, mainly fatigue, during twice daily exams over the

following two weeks. *E.g.*, Medical Report dated July 21, 2020, PageID.331. By July 28, 2020, it was noted that Brownlee reported "feeling great" and asked, "May I leave now?" *Id.* at PageID.298. She was reported to be fully recovered and was discharged to the general population on August 4, 2020. *Id.* at PageID.266. However, in the interim she was prescribed another medication to control a persistently elevated heart rate (over 125 BPM), which had arisen within the prior two weeks. Medical Report dated July 30, 2020, PageID.293.

Because she has at least two recognized serious medical risk factors, has no guarantee of any prospective immunity, and was hospitalized with grave symptoms and required extensive treatment to counter her previous infection, and because there continue to be active cases at the facility where she is confined, the defendant has established that she faces an extraordinary and compelling medical risk due to possible reinfection.

Because she has at least two recognized serious medical risk factors, has no guarantee of any prospective immunity, and was hospitalized with grave symptoms and required extensive treatment to counter her previous infection, and because there continue to be active cases at the facility where she is confined, the defendant has established that she faces an extraordinary and compelling medical risk due to possible reinfection. Those circumstances adequately demonstrate that the defendant faces an ongoing risk of serious or fatal consequences from reinfection, where there are active cases of the virus in the facility where she is confined, and no convincing medical evidence establishes that her prior bout with the virus affords any prospective protection from contracting it again. And despite her extensive criminal history, in her current state the factors listed in 18 U.S.C. § 3553(a) do not militate against relief in this case.

III.

The government does not dispute that Brownlee has exhausted her administrative remedies and concedes that she has established "extraordinary and compelling" reasons for relief within the meaning of 18 U.S.C. 3582(c)(1)(A)(i).  The balance of the other pertinent factors weigh in favor of her request for relief.

Accordingly, it is **ORDERED** that the defendant's motion for compassionate release (ECF No. 41) is **GRANTED**.

It is further **ORDERED** that the defendant's term of custody is **REDUCED** to time served.

It is further **ORDERED** that this order is stayed for up to fourteen days to allow the Bureau of Prisons to verify the defendant's residence and release plan, to make appropriate travel arrangements, and to ensure the defendant's safe release after the defendant is quarantined.  The defendant shall be released as soon as a residence is verified, a release plan is established, appropriate travel arrangements are made, quarantine is complete, and it is safe for the defendant to travel.  There shall be no delay in ensuring travel arrangements are made.  If more than fourteen days are needed to make appropriate travel arrangements and ensure the defendant's safe release, the parties shall immediately notify the Court and show cause why the stay should be extended.

It is further **ORDERED** that under 18 U.S.C. § 3582(c)(1)(A), the defendant must serve a "special term" of supervised release of 18 months (in addition to the supervised release term previously ordered).  During that special term, the defendant must confine herself to her place of residence, except for work, medical appointments, religious services, and purchasing necessities. The defendant will be subject to GPS location monitoring for the first 360 consecutive days of her home confinement.   However, if the defendant is in full compliance with her conditions of

supervised release, the probation officer, after 180 days, may discontinue GPS location monitoring.  The Court will enter an amended judgment and commitment.

It is further **ORDERED** that the defendant must provide to the probation office in the district where she will be released the complete address where she will reside upon release.

<div style="margin-left:50%">

s/David M. Lawson

DAVID M. LAWSON

United States District Judge
</div>

Dated:  October 16, 2020